UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERMORIO S.A. E.S.P., <u>et al.</u>,     ) | |
|     ) | |
| Plaintiffs,     ) | |
|     ) | |
| v.     ) | Civil Action No. 03-2587 (PLF) |
|     ) | |
| ELECTRIFICADORA DEL ATLANTICO     ) | |
| S.A. E.S.P., <u>et al.</u>,     ) | |
|     ) | |
| Defendants.     ) | |
|     ) | |
| _____ ) | |

**<u>MEMORANDUM</u>**

Plaintiffs sue in this United States district court to enforce an arbitral award rendered in the Republic of Columbia, by Columbian arbitrators, pursuant to an agreement between Columbian companies to buy and sell electrical power in Columbia.  Separate from the enforceability case before us, defendants and plaintiffs also brought suit against each other in Columbia; one of those cases is still pending.

Currently pending in this case is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.[1]  For reasons explained below, the motion is granted, and plaintiffs' complaint is dismissed on the merits.  In the alternative, the complaint is dismissed on the ground of forum non conveniens because Columbia is an adequate and a more appropriate forum for resolution of this case.

---

[1]This motion was transferred by consent to the undersigned for decision.  <u>See</u> Dec. 5, 2005 Order.

I.      **The Complaint**

    A.      **Background**

Plaintiffs' Amended Complaint alleges the following facts.  Plaintiff TermoRio is a public utility corporation, incorporated under the laws of the Republic of Columbia, with its principal place of business in Barranquilla, Columbia.  Plaintiff LeaseCo Group, LLC is an Oregon corporation with its principal place of business in Portland, Oregon.

Defendant Republic of Columbia is a foreign state.  Defendant Electrificadora del Atlantico S.A. E.S.P. ("Electranta"), incorporated in 1957 to provide electricity services in and around Barranquilla, Columbia, was 87% owned and controlled by Columbia.  Consequently, it is an agency or instrumentality of Columbia within the meaning of the Foreign Sovereign Immunities Act (28 U.S.C. § 1603(b)).

In the mid-1990s, Columbia's Atlantic coast experienced significant electricity shortages. In 1995 LeaseCo entered into discussions with Electranta to modernize Electranta's operations and build a new power plant in Columbia.  A year later, LeaseCo and Electranta formed two Columbian entities seriatim: first, Coenergia, and then TermoRio.  Coenergia owned 99.9% of all shares of TermoRio.  Initially, LeaseCo and Electranta owned roughly equal shares of Coenergia, so that they accordingly owned roughly equal shares of TermoRio.  However, at the time of Electranta's complaint (in June 2004), LeaseCo and Electranta were transferring sole ownership of the 99.9% of the shares of TermoRio to LeaseCo.

At the heart of this lawsuit is a Power Purchase Agreement between TermoRio and Electranta in June 1997 (the "Agreement").  Under this Agreement, TermoRio agreed to generate energy and Electranta agreed to buy it.  In reliance on this Agreement, TermoRio invested more

than $7 million to construct a power plant.  The Agreement also provided that any dispute between the parties would be resolved by binding arbitration in Columbia.

However, in March 1998, Columbia announced a plan to sell the assets of all its Atlantic Coast utilities, including Electranta, to private owners and other Columbian utilities.  On April 16, 1998, Columbia began to privatize by creating a new company, Electrocaribe, to receive and hold Electranta's assets and liabilities.  However, at the behest of Columbia, Electranta did not transfer its duties under the Agreement to buy power from TermoRio.  Electranta was left with obligations under the Agreement to buy power, but no resources to do so.  As a result, Electranta failed to buy power from TermoRio and breached the Agreement.[2]  This breach of the Agreement, plaintiffs allege, "had a direct effect in the United States affecting the extensive marketing of [Electrocaribe's] assets in the United States, by affecting the price of these assets, by causing United States purchasers to acquires a substantial interest in these assets, and by eliminating any obligation for Electrocaribe and [Reliant] to fulfill the [Agreement.]" Compl. ¶ 22.

## B.      The Arbitration Clause in the Agreement

The Agreement's arbitration clause provides (as translated):

Any dispute or controversy arising between the Parties in connection to the execution, interpretation, performance or liquidation of the Contract shall be settled through mechanisms of conciliation, amiable composition or settlement, within a term no longer than three weeks.  If no agreement is reached, either party may have recourse to an arbitral tribunal that shall be governed in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce.  The tribunal shall be made up of three (3) members appointed by the Chamber, and shall be seated in the city of Barranquilla.  The award, which shall

---

[2]Thereafter, Columbia sold Electrocaribe's stock to, inter alia, a Houston company called Houston Industries Incorporated (now known as Reliant Energy HL&P).

be binding on the parties, must be rendered within a maximum term of three months.[3]

Pursuant to this provision, after defendants failed to meet their obligations under the Agreement, the parties entered into a long arbitration process.  On December 21, 2000, a Tribunal of three arbitrators, applying ICC procedural rules, determined that Electranta breached the Agreement at the direction of Columbia.  The Tribunal ordered Electranta to pay TermoRio an award of $60.3 million USD.

### C.    Defendants' "Attack" on the Arbitration Process

Neither the Republic of Columbia nor Electranta has complied with the $60 million arbitral award, and both have refused to pay any portion of it.  Plaintiffs allege that Columbia and Electranta have also sought to undermine the award in several other respects.

First, in 1998, Columbia (through a governmental agency) filed an action with a trial court in Barranquilla, seeking to invalidate the Agreement.  The Columbian trial court dismissed the suit.  The Council of State – Columbia's highest administrative court – upheld the dismissal. However, in 2001, shortly after the Tribunal issued its opinion and award, the Council of State reconsidered its decision and permitted Columbia's suit to go forward.

In a separate action, on December 23, 2000 (right after the Tribunal issued the award), Electranta filed an "extraordinary writ" with a court in Barranquilla, seeking to overturn the award.  In response the Council of State vacated it.  The Council of State reasoned that the arbitration had to be conducted in accordance with Columbian law, and Columbian law in effect as of the date of the Agreement did not expressly permit the use of ICC procedural rules in

---

[3]See Compl. ¶ 26 (emphasis added).

arbitration.

In yet another action, plaintiff TermoRio filed two lawsuits in Columbian courts to rescind the transfer of Electranta's assets and to hold Columbia liable for breach of the Agreement.  A Columbian court dismissed the first action on procedural grounds.  See Opp. 20. The second count is still pending in the Columbian court system.  See Supp. Joint Briefing (Feb. 17, 2006).  However, plaintiffs also state that in November 2005 TermoRio was liquidated and assigned its litigation rights to LeaseCo, and LeaseCo's attorney in Columbia resigned because of "out-of-court interferences."  Moreover, in December 2005 LeaseCo "determined that it must withdraw the breach of contract action."  Pltffs' Supp. Briefing (Feb. 17, 2006), at 1-2.  To date, no evidence has been submitted that LeaseCo has done so.

Finally, according to the complaint:

> At various times following the issuance of the Arbitral Award, [Columbia] initiated frivolous criminal charges and investigations against individuals associated with the arbitration, including the manager of the TermoRio project, the attorney for TermoRio during the arbitration proceeding, the independent economic experts who testified as to damages in the arbitration proceeding, and a member of LeaseCo.  These charges were not based upon a good faith interpretation and application of Columbian law but were brought in bad faith to intimidate persons who might support the Arbitral Award, and to create the perception among the Columbian public that the Arbitral Award was unfair and corrupt.

Compl. ¶ 36.

**D.     Plaintiffs' Claims**

Based on these facts, plaintiffs alleged four causes of action.  However, pursuant to stipulation, they subsequently dropped two claims (fraudulent conveyance and expropriation). See Opp. at 2 n.2.  The claims for (1) enforcement of the Arbitral Award pursuant to the U.S.

Arbitration Act, 9 U.S.C. § 201 et seq.; and (2) breach of contract remain.

1.    Enforcement of the Arbitral Award

Plaintiffs maintain that the award of the Columbian Tribunal is enforceable in this court because the United States and Columbian have signed agreements to enforce other nation's arbitral awards.

The United States has ratified and codified two Conventions that allow courts in one country to enforce arbitral awards rendered in other signatory countries. See Inter-American Convention on International Commercial Arbitration (the "Panama Convention") (reprinted after 9 U.S.C. § 301), and The Convention on the Recognition and Enforcement of Arbitral Awards (the "New York Convention") (reprinted after 9 U.S.C. § 201). Columbia is a signatory to both of these Conventions. The New York Convention provides that signatory nations are to recognize and enforce arbitral awards rendered in other nations. See New York Convention Art. III. However, enforcement of awards "may be refused" if, inter alia, they were set aside by a competent authority in the country in which the award was made. See New York Convention Art. V(1)(e).

Plaintiffs maintain in this court that the arbitral award in this case falls under both the New York and Panama Conventions,[4] and this court accordingly should enforce the Columbian award. Further, plaintiffs allege that Electranta falls under the Conventions because it is an alter ego of Columbia.

---

[4]Plaintiffs maintain that the Panama Convention applies to this dispute because a majority of the parties to the arbitration agreement are citizens of states that have ratified the Panama Convention. See 9 U.S.C. § 305(1). However, codification of the Panama Convention incorporates by reference the relevant provisions of the New York Convention (see 9 U.S.C. § 302), making discussion of the Panama Convention unnecessary.

2.      Breach of Contract

Plaintiffs also contend that Electranta violated the terms of the Agreement, and that TermoRio, in contrast, fully performed its obligations (to the extent feasible in light of Electranta's violations). Moreover, the actions of Columbia and Electranta in breaching the Agreement "were based in part upon and directly related to acts performed in the United States and had a direct effect in the United States." Compl. ¶ 47. As a result, plaintiffs claim the alleged breach of the Agreement cost them $60 million in lost profits, expenses and additional damages. See id. ¶ 48.

## II.     Defendants' Motion to Dismiss

On June 30, 2004, defendants moved to dismiss the complaint based on the following grounds: (1) LeaseCo should be dismissed as a plaintiff for lack of standing; (2) the court lacks subject matter jurisdiction by operation of the Foreign Sovereign Immunities Act and because the statute of limitations barred the suit; (3) the court lacks personal jurisdiction because defendants were not adequately served; (4) the court should abstain from ruling in light of the pending lawsuit in Columbia; (5) the complaint should be dismissed on the ground of forum non conveniens; and (6) the complaint should be dismissed for failure to state a claim because the Columbian courts have nullified the award.

As explained below, an accompanying Order dismisses LeaseCo for lack of standing. The court lacks subject matter jurisdiction over plaintiffs' breach of contract claim both under the Foreign Sovereign Immunities Act and by operation of the applicable statute of limitations. Although the court has subject matter jurisdiction over the remaining arbitral award enforcement claim, it is dismissed for failure to state a claim; the Columbian courts have vacated the award.

In the alternative, the order dismisses the complaint on the ground of forum non conveniens.  In this light, defendants' remaining arguments regarding abstention, dismissal of Columbia as a party, and service of process on defendants need not be addressed.

A.      **LeaseCo's Standing**

Defendants allege that LeaseCo lacks standing to bring its claims, because LeaseCo is merely a "stockholder of a stockholder" of the other plaintiff, TermoRio.  LeaseCo was not otherwise a party to the Agreement, arbitration, or any of the actions commenced in Columbia. When courts are determining whether a shareholder's claims are derivative of the corporation's claims for standing purposes, they apply the law of the state of incorporation.  See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 & n.10 (1991).  Under Oregon law (the state of LeaseCo's incorporation), individual shareholders can bring suit if their claims are distinct from the claims that the corporation could bring.  If the shareholders' claims are derivative of the corporation's claims, however, the shareholders lack standing to sue.  See Caplender v. U.S. Nat'l Bank of Oregon, 317 Ore. 506, 515 (1993).  Shareholders may also bring suit if the corporation fails to sue for reasons other than a good-faith business judgment.  See Franchise Tax Bd. of Calif. v. Alcan Aluminium, 493 U.S. 331, 336 (1990).

LeaseCo contends it has a direct and personal interest in the outcome.  However, as plaintiffs themselves make clear, LeaseCo is suing only because it suffered harm as a shareholder of TermoRio, a reason insufficient for standing under Caplender.  See Opp. Br. 57-58.  That LeaseCo is, or has become, the sole shareholder does not change the analysis.  See Franchise Tax, 493 U.S. at 333.  Moreover, the subsidiary corporation (TermoRio) has brought suit and is a plaintiff in this litigation, so the Franchise Tax exception does not apply.

This conclusion is unaffected by the fact that, according to plaintiffs, TermoRio was liquidated on November 30, 2005 and its litigation rights assigned to LeaseCo. Despite this transaction, TermoRio remains a party for purposes of determining jurisdiction and the substantive rights of the parties. As the Federal Rules provide, "[i]n case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). There has been no such motion or court ruling here.

The foregoing considered, LeaseCo is before the court solely as a stockholder qua stockholder and lacks standing to bring suit against the defendants. Accordingly, the accompanying order dismisses LeaseCo as a party for lack of standing.

**B.     Subject Matter Jurisdiction**

1.     Jurisdiction under Foreign Sovereign Immunities Act

The plaintiffs contend that the court has subject matter jurisdiction over the defendants by operation of the Foreign Sovereign Immunities Act (28 U.S.C. § 1330(a)). This provision of the Act provides the sole basis for jurisdiction in any civil action against a "foreign state as defined in [28 U.S.C. § 1603(a)] . . . with respect to which the foreign state is not entitled to immunity either under [28 U.S.C. §§ 1605-1607] or under any applicable international agreement." See Argentine Repub. v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); BPA Int'l, Inc. v. Kingdom of Sweden, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) ("foreign state" includes instrumentalities of a foreign state).

Columbia is obviously a foreign state, and Electranta is concededly an instrumentality of

Columbia.  However, the sovereign immunity of states and their instrumentalities is subject to

certain exceptions.  See 28 U.S.C. §§ 1605(a).  The relevant exceptions are addressed below, as

applied to the arbitral award claim and to the breach of contract claim.

<em>a.     Arbitral Award Claim</em>

The Foreign Sovereign Immunities Act provides that a foreign state is not immune from

suit if

> the action is brought . . . to confirm an award made pursuant to[] an agreement to
> arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or
> other international agreement in force for the United States calling for the
> recognition and enforcement of arbitral awards . . .

28 U.S.C. § 1605(a)(6).

Defendants concede that both Columbia and the United States are parties to conventions

providing for recognition of arbitral awards under certain circumstances.  Yet defendants contend

that the Columbian courts have vacated the arbitral award so that there is nothing to enforce and

accordingly no basis for jurisdiction by operation of a sovereign immunity exception.  However,

a foreign court's vacatur of an arbitral award does not always control whether this court has

jurisdiction over a matter.  For example, the New York Convention (codified in U.S. law)

provides that recognition of a foreign award *may* be refused if it has been nullified by a foreign

court.  See New York Convention Art. V(1)(e).  To establish a rule that a U.S. court *must* dismiss

a case because a foreign court nullified an arbitral award would violate the New York

Convention provision.  See, e.g., In re Chromalloy Aeroservices, 939 F. Supp. 907, 909 (D.D.C.

1996) (jurisdiction exists under 28 U.S.C. § 1605(a)(6) when Egyptian courts nullified arbitral

award).  If a foreign court's decision automatically deprived a U.S. court of jurisdiction to

10

consider the matter, then foreign judgments obtained fraudulently, for example, would be unremediable in U.S. courts.

In addition, the Columbian defendants contend that this is a "purely domestic arbitration" in that it involves only Columbian parties. However, the law regarding enforcement of arbitral awards does not distinguish between foreign and domestic parties. The relevant inquiry is whether "the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B). Moreover, under the New York Convention signatory states are to enforce foreign awards as well as domestic.[5] Accordingly, construing all allegations in favor of plaintiffs, there is subject matter jurisdiction in this court over the claim to enforce the arbitration award. The question remains whether there is subject matter jurisdiction over the breach of contract claim under the Foreign Sovereign Immunities Act.

        *b.*     *Breach of Contract Claim*

Section 1605(a)(2) of the Foreign Sovereign Immunities Act provides that a foreign state is not immune from suit if

> the action is based upon [I] a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon

---

[5]The New York Convention expressly provides that it is applicable to all arbitral awards "not considered as domestic awards in the State where their recognition and enforcement are sought." "[N]ot considered as domestic awards," in turn, has been interpreted to include awards involving parties outside of the jurisdiction of the court that seeks to enforce it. See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2nd Cir. 1997); see also Siderurgica del Orinoco v. Linea Naviera de Cabotaje, 1999 WL 632870, at *1, *4 (S.D.N.Y. Aug. 19, 1999) (court has jurisdiction over petition to compel arbitration under international conventions with respect to a contract "between a Venezuelan steel producer and a Venezuelan shipowner for the transportation of steel between Venezuelan ports.").

an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

An action is "based upon" commercial activity "<u>only if that activity constitutes an 'element[] of a claim</u> that, if proven, would entitle a plaintiff to relief under his theory of the case.'" <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993) (citations omitted) (emphasis added).  None of these three alleged bases creates jurisdiction here.

<em>i.      "Commercial activity carried on in the United States"</em>

Plaintiffs argue that jurisdiction exists under the Foreign Sovereign Immunities Act based on commercial activities in the United States conducted by Electranta, the entity that was 87% owned by the Republic of Columbia and, for purposes of this analysis, presumably Columbia's alter ego.

Plaintiffs argue that the following commercial acts of Electranta and Columbia support the application of the commercial activities exception of the FSIA: "(a) the sale of Electranta's assets to an American investor, (b) the marketing of these assets through a road show in the United States, and (c) negotiation and contractual obligations to United States investors breached by the sale of these assets to an American investor."  Opp. at 29.

None of the three factual bases presented by plaintiffs constitutes an element of the claim of breach of contract.  The decision to sell Electranta's assets was allegedly part of a Columbian privatization plan.  It was fortuitous that the ultimate purchaser of Electranta's assets was American; it could have been any other nationality.  Nor was marketing of the assets in the United States an activity that is an element of a claim.  The alleged violation of the contract occurred because of the privatization plan; the road show was clearly not an element of the

contract violation.

The third allegation of commercial activity is confusingly worded, although it appears to suggest that LeaseCo was harmed when Electrocaribe sold Electranta's assets to U.S. investors. LeaseCo is no longer a party.  Moreover, as explained above, the fact that the sale was to an American investor is not an element of the contract breach claim.  The identity of the purchaser of the assets is irrelevant.

ii.    *"An act performed in the United States in connection with a commercial activity of the foreign state elsewhere"*

Plaintiffs essentially reargue the same points as above (indeed, it is not clear that plaintiffs intend to argue both § 1605(a)(2)(I) and § 1605(a)(2)(ii)).  The flaw in the analysis is the same: none of the alleged commercial activities constitutes an element of the claim of breach of contract.  As a result, plaintiffs have failed to plead a commercial activity in the United States.

iii.    *"An act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States"*

Plaintiffs attempt to establish a direct effect in the United States by arguing that Columbia's alleged "actions in planning to breach the contract and in breaching the contract" deprived U.S. shareholders of the value of their shares.  Plaintiffs appear to be arguing that the loss suffered by LeaseCo constitutes a direct effect.  However, LeaseCo lacks standing and is no longer a plaintiff in this proceeding, and accordingly any proposed effect on LeaseCo is irrelevant.  Moreover, it has not gained jurisdiction because TermoRio transferred its litigation rights to it; TermoRio remains the sole plaintiff in this matter for jurisdictional purposes.  See 6 Moore's Fed. Prac. § 25.30[7] (2000) ("Substitution has no effect on subject matter

jurisdiction."); cf. Burka v. Aetna Life Ins. Co., 87 F.3d 478, 482 (D.C. Cir. 1996) (substitution of non-diverse party does not defeat jurisdiction).  Although Burka held that jurisdiction cannot be *defeated* by substitution, by extension jurisdiction cannot be *created* by substitution either. This rule is based on the requirement that jurisdiction be established by the facts alleged in the complaint.  See Mullen v. Torrance, 22 U.S. 537, 539 (1824); see also Freeport-McMoRan, v. K N Energy, 498 U.S. 426, 429 (1991) ("diversity jurisdiction is to be assessed at the time the lawsuit is commenced."); Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840-41 (1989).  In Saadeh v. Farouki, 107 F.3d 52 (D.C. Cir. 1997), the D.C. Circuit held that the corollary of the Freeport rule is that, if diversity does not exist when the complaint was filed, it cannot be created by a party's change in domicile.  Id. at 57 (citations omitted).

Plaintiffs also seem to argue that the sale of the assets to American investors had a direct effect on the investors as well.  However, when the cause of action is breach of contract, a "direct effect" means a "nontrivial" one which must "follo[w] as an immediate consequence of the defendant's activity."  Repub. of Argentina, 504 U.S. at 618 (citation, internal quotation marks, and ellipses omitted).  "[T]he direct effect test is interpreted to require a clause in a contract mandating the fulfillment of contractual obligations *in the United States*."  Atl. Tele-Network v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126, 134 (D.D.C. 2003) (emphasis in original).  None of the alleged activities identified above (marketing Electranta's assets in the U.S. and the stock price paid by non-party purchasers) is a contractual obligation created by the Agreement.  There is not a sufficient nexus between the Agreement and the United States, particularly when LeaseCo is no longer a party, to sustain a direct effect in the United States from defendant's alleged breach of the Agreement.

The case of <u>Goodman Holdings v. Rafidain Bank</u>, 26 F.3d 1143 (D.C. Cir. 1994) is particularly instructive here.  In that case Goodman Holdings, an Irish corporation, sought to recover $300,000 due on letters of credit issued by Rafidain Bank and Rasheed Bank, both of which were branches of the Iraqi government.  The letters of credit drew primarily on accounts in the United States.  The district court dismissed the complaint for lack of subject matter jurisdiction, finding that there was an insufficient commercial nexus with the United States to sustain an exception to sovereign immunity.  The court of appeals affirmed.  As a threshold matter, the court held that a claim is "based upon" a commercial activity only if it is an element of plaintiff's claim for relief.  <u>Id.</u> (quoting <u>Saudi Arabia v. Nelson</u>, 507 U.S. at 357).  Regarding the first exception to immunity (commercial activity in the United States), the court concluded that Goodman had "at most established a 'relationship' or 'connection' between its claim and the domestic commercial activity alleged here – Rafidain's maintaining accounts in United States banks and paying Goodman from those accounts."  <u>Id.</u> at 1146.  However, this connection did not meet the <u>Nelson</u> test of constituting an element of plaintiff's claim.  <u>Id.</u>

The court also rejected the argument that the activities at issue caused a direct effect in the United States.  For guidance the court looked to <u>Repub. of Argentina v. Weltover</u>, 504 U.S. 607 (1992).  In that case, Argentina contracted to make bond payments into New York bank accounts.  Argentina subsequently ended the payments and sought to reschedule the debt.  In rejecting immunity for Argentina, the Court held that "[b]ecause New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States:  Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  <u>Id.</u> at 619.

However, the Goodman court distinguished Weltover on a factual basis.  In Goodman, there was no U.S. location that was designated as the "place of performance" where money was supposed to have been paid by Rafidain.  As the court held, "Rafidain might well have paid them from funds in United States banks but it might just as well have done so from accounts located outside of the United States."  26 F.3d at 1146-47 (emphasis added).  On this basis, the court found that using banks in the United States did not have a "direct effect" in this country.

Similarly, here the effect in the United States was not an "immediate consequence" of defendants' activities.  Moreover, there was no contractual obligation in the United States, the breach of which had an effect here.  This case is very similar to Goodman in that the connection to or effect in the United States is fortuitous.

Prevailing authority in this Circuit compels the conclusion that this court lacks subject matter jurisdiction over the breach of contract claim.

### 2.    Statute of Limitations

As a separate ground for dismissal of the breach of contract claim, defendants argue that plaintiffs' claim is barred by the applicable statute of limitations.  In the District of Columbia, courts apply the law of the forum to determine if a claim is barred by the statute of limitations, including in cases arising under the Foreign Sovereign Immunities Act.  See Gibson v. Repub. of Ireland, 682 F.2d 1022, 1025 (D.C. Cir. 1982).  The statute of limitations for breach of contract claims is three years from "the time the right to maintain the action accrues."  D.C. Code § 12-301(7) (2006).  Defendants maintain that the three years has run.  TermoRio filed suit in Columbia based on the same contract claim on July 27, 2000, more than three and a half years before it filed suit here on December 19, 2004.  See Mot. to Dismiss Am. Compl. Ex. 9

16

(Marquez Decl.) ¶¶ 4; 6.  Thus, according to defendants, the contract claim is barred.

Plaintiffs do not contest these basic facts.[6]  Instead, they maintain that there should be an equitable tolling of the statute of limitations.  In support they cite Chung v. U.S. Dept. of Justice, 333 F.3d 273 (D.C. Cir. 2003).  Chung explained that equitable tolling applies when the plaintiff "despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim."  Id. at 278 (internal quotation marks and citation omitted).  Plaintiffs do not argue that they were prevented from obtaining vital information.  Indeed, they filed suit on this same breach of contract claim in Columbia.  This fact is fatal to their equitable tolling argument.[7]

### C.    Fails to State a Claim upon which Relief May Be Granted

Because the contract claim is dismissed for lack of subject matter jurisdiction, the only issue remaining is whether there is a basis to dismiss the motion to enforce the arbitral award. Defendants seek to dismiss this motion for failure to state a claim upon which relief can be granted.  They argue U.S. courts cannot enforce an arbitration award if it has been set aside by a competent tribunal in a foreign country.

There are very few cases that address the question of whether a U.S. court should enforce an arbitral award when a foreign court has nullified that same award.  See Chromalloy Aeroservices v. Arab Repub. of Egypt, 939 F. Supp. 907 (D.D.C. 1996); Baker Marine (Nig.)

---

[6]See Mot Hearing Tr. (2/23/06), at 60 (the three-year statute of limitations in the District of Columbia "does present us with significant problems on our contract action, and we believe that we have set up reasons why there should be an equitable tolling of that, but we do not lightly cast off the statute of limitations on the contract claim.") (counsel for plaintiffs).

[7]Plaintiffs also cite Burnett v. N.Y. Cent. R.R. Co., 380 U.S. 424 (1965) to support their equitable tolling argument.  Burnett concerned equitable tolling of a federal lawsuit while a state lawsuit was pending, and hence is inapplicable here.

Ltd. v. Chevron (Nig.) Ltd., 191 F.3d 194 (2nd Cir. 1999); Spier v. Calzaturificio Tecnica, S.p.A.,

71 F. Supp. 2d 279 (S.D.N.Y. 1999).  Although Chromalloy ultimately is distinguishable from

this case in several key respects, it is noteworthy for establishing the analytic framework for the

two subsequent cases.

      1.    *Chromalloy*

Chromalloy (a U.S. corporation) contracted with Egypt to service and supply Egyptian

Air Force helicopters.  This contract contained an arbitration clause, which provided that it was

"understood that both parties have irrevocably agreed to apply Egypt [sic] Laws and to choose

Cairo as seat of the court of arbitration . . . . The decision of the said court shall be final and

binding and cannot be made subject to any appeal or other recourse."  939 F. Supp. at 912

(quoting Appx. E to Contract).

In December 1991, Egypt announced that it was terminating the contract.  Chromalloy

commenced arbitration proceedings.  In apparent retaliation, Egypt drew over $11 million from

Chromalloy's letters of credit.  In August 1994, the arbitral panel ordered Egypt to pay

Chromalloy over $17 million.  Id. at 908.

After Egypt filed suit in Egypt to nullify the award, Chromalloy moved to enforce the

award in this court.  The court found jurisdiction over Egypt under the commercial activities

exception to the Foreign Sovereign Immunities Act.  See id.  It recognized that the award was

made in Egypt, under Egyptian law, and "has been nullified by the court designated by Egypt to

review arbitral awards.  Thus, the Court may, at its discretion, decline to enforce the award."  Id.

However, the court noted that the New York Convention provides that it shall not

"deprive any interested party of any right he may have to avail himself of an arbitral award in the

18

manner and to the extent allowed by the law . . . of the country where such award is sought to be

relied upon."  New York Convention Art. VII.  In that light, the question was whether, in the

absence of the Convention, the Federal Arbitration Act ("FAA") would have provided

Chromalloy a means to enforce the arbitration award.  It found that there was no basis under the

FAA to set aside the award, and hence the award was enforceable.  939 F. Supp. at 909.

        As a result, the court considered whether the decision of the Egyptian court should be

recognized as a valid foreign judgment, particularly when the arbitration clause precluded

judicial review.  A U.S. court will enforce the judgment of a foreign court if there was proper

service of process, and the "original claim [does] not violate U.S. public policy."  Id. at 913

(quoting Tahan v. Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981)).   The district court found a

"strong public policy" of enforcing binding arbitration clauses.  Recognition of the Egyptian

court's decision would violate this public policy.  Id.

        The court then considered if considerations of "international comity" compelled it to

accept the foreign court's judgment.  Somewhat anomalously, the court examined this question

under the act of state doctrine, and relied on W.S. Kirkpatrick & Co, Inc. v. Environmental

Tectonics Corp, Int'l, 493 U.S. 400 (1990).  In that case, the Court held that "the acts of foreign

sovereigns taken within their own jurisdictions shall be deemed valid.  [However, t]hat doctrine

has no application to the present case because the validity of no foreign sovereign act is at issue."

Id. at 409.  As a result, the district court held that the issue was whether it should give res

judicada effect to the Egyptian court's decision, not whether the case was properly decided under

Egyptian law.  With the issue framed in this manner, the court concluded that its decision to not

afford res judicada effect to the Egyptian court's decision was not a judgment about the Egyptian

19

court's decision itself, but rather a decision to enforce the strong U.S. policy in favor of enforcing arbitral awards.

The court's decision in Chromalloy is both questionable on the merits and distinguishable on the facts.  The question in Chromalloy was whether to enforce a foreign court's judgment, not whether (as in Kirkpatrick) it should abstain from passing judgment on a foreign state's actions. The policy bases behind enforcing foreign court judgments – reciprocity, avoiding forum shopping, and avoiding duplicative litigation – are not relevant in the context of Kirkpatrick.

More generally, the instant case is factually distinguishable from Chromalloy on several grounds.  First, there is no longer a U.S. party involved in this case, as there was in Chromalloy. The lack of a U.S. party diminishes the U.S. interest in applying U.S. law; indeed, the presence of a U.S. party in Chromalloy arguably was decisive.[8]  Second, there is no jurisdiction under the commercial activities exception of the Foreign Sovereign Immunities Act in this case (see supra Part II.B.1.b.), as there was in Chromalloy.  As a result, even assuming that one could set aside the New York Convention and look to the Federal Arbitration Act, this Court would lack jurisdiction to consider the matter.  Third, the Chromalloy court seemed to rely heavily on the fact that Egypt sought "to repudiate its solemn promise to abide by the results of the arbitration" in breach of the contractual agreement that the arbitration decision "shall be final and binding and cannot be made subject to any appeal or other recourse."  939 F. Supp. at 912.  Here, in contrast, the agreement did call for the arbitration to be "binding," but it did not expressly

---

[8]See Radu Lelutiu, "NOTE & COMMENT: Managing Requests for Enforcement of Vacated Awards under the New York Convention," 14 Am. Rev. Int'l Arb. 345, 355 (2003) (stating that the "court's analysis is filled with nationalistic partisanship" and "the decisive factor in the court's rationale was the citizenship of Chromalloy Aeroservices.").

preclude judicial review, or say it was final.

Fourth and finally, although it is not mentioned by the Chromalloy court, the petitioners first filed suit in the United States, before Egypt filed suit in its own country. There is a strong policy preference for favoring the first-filed suit, including in the international context. See Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976); Cont'l Time Corp. v. Swiss Credit Bank, 543 F. Supp. 408 (S.D.N.Y. 1982) (complaint should be dismissed in recognition that parties previously initiated litigation in Switzerland on the same set of issues). In this case, Cont'l Time counsels in favor of respecting the Columbian court's judgment, particularly when the matter has been fully litigated there and plaintiffs have filed suit there.

2.     *Baker Marine*

The case of Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd., 191 F.3d 194 (2nd Cir. 1999) is more on point. There Baker Marine and Danos entered into a contract to provide barge services to Chevron in Nigeria. The contract included an arbitration clause. All parties (except Chevron, Inc.) were Nigerian, and the parties specified that Nigerian law should apply. Baker Marine charged Danos and Chevron with violating their respective contracts. Two sets of arbitrators were empaneled in Lagos, Nigeria. The first panel award Baker $2.23 million in damages against Danos; the second awarded Baker $750,000 against Chevron.

Baker promptly moved to enforce these awards in the Nigerian Federal High Court. Danos and Chevron appealed to the same court to vacate the awards. The Nigerian court set aside both arbitration awards on several grounds. In August 1997, Baker brought two actions in the Northern District of New York, seeking enforcement of the awards under the New York Convention. The lower court dismissed Baker's petitions, finding that "it would not be proper to

enforce a foreign arbitral award under the [New York] Convention when such an award has been

set aside by the Nigerian courts." Id. at 196.

On appeal Baker contended that reasons cited by the Nigerian courts would not be

recognized under U.S. law as valid grounds for vacating an arbitral award.  The court of appeals

rejected this argument, ruling that there was no evidence that the Nigerian courts acted contrary

to Nigerian law.  Moreover, as a policy matter it found that

> mechanical application of domestic arbitral law to foreign awards under the
> Convention would seriously undermine finality and regularly produce conflicting
> judgments.  If a party whose arbitration award has been vacated at the site of the
> award can automatically obtain enforcement of the awards under the domestic
> laws of other nations, a losing party will have every reason to pursue its adversary
> "with enforcement actions from country to country until a court is found, if any,
> which grants the enforcement."

Id. at 197 n.2 (citation omitted).

The Second Circuit also distinguished Chromalloy, upon which Baker apparently relied.

The plaintiff in Chromalloy was a U.S. citizen; Baker was not.  Moreover, Chevron and Danos

did not violate any provision in the contract precluding judicial review, as in Chromalloy.

> 3.      *Spier*

A third relevant case is Spier v. Calzaturificio Tecnica, S.p.A., 71 F. Supp. 2d 279

(S.D.N.Y. 1999).  In that case, Spier, an American citizen, contracted with Tecnica, an Italian

corporation, to provide Tecnica with expertise to manufacture plastic footwear and ski boots in

Italy.  Their contract had an arbitration clause.  A few years after signing the contract, the parties

had a dispute, Spier invoked the arbitration clause, and an Italian arbitration panel awarded Spier

one billion Italian lire plus 15% annual interest.

On November 20, 1995, Tecnica challenged the arbitral award in Italian courts.  On June

23, 1996, Spier filed an action in the Southern District to enforce the award.  The district court stayed consideration of the issue until the Italian litigation was completed.  The lower Italian court then nullified the award.  The Court of Appeals of Venice affirmed the judgment.  The Supreme Court of Cassation, Italy's highest court.  All three courts ruled that the arbitrators exceeded their authority by issuing an award based on an inferred agreement that was not contemplated by either party.  Despite these rulings, Spier returned to the Southern District to enforce the award pursuant to the New York Convention.

The district court, in considering whether the Italian courts' decisions should be adhered to, discussed both Baker Marine and Chromalloy.  The court noted that, as in Chromalloy, the plaintiff was a U.S. citizen and sought confirmation of the award in the United States.  However, the court read Baker Marine's comments concerning Egypt's violation of its "solemn promise" to not appeal the arbitral award to be the "decisive circumstance" supporting the court's decision.  As the district court explained, "[o]nly that circumstance is singled out as violating American public policy articulated in the [Federal Arbitration Act], thereby justifying the district court's enforcement of the Egyptian award."  Id. at 287.  Although acknowledging that the court's decision to defer to the Italian court's decisions was discretionary, it concluded that plaintiff provided "no adequate reason for refusing to recognize the judgments of the Italian courts."  Id. at 288.

4.    Analysis and Conclusion

As recited above, this case involves a dispute involving Columbian parties over a contract to perform services in Columbia which led to a Columbian arbitration decision and Columbian litigation.  In consideration of these facts and the foregoing three cases, plaintiffs cannot seek to

enforce their arbitral award here unless the Columbian courts' decisions violated U.S. public policy. See Baker Marine, 191 F.3d at 197 n.3.

For a foreign court's decisions to be contrary to U.S. public policy, it must be "'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" Tahan v. Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981) (quoting Restatement (Second) Conflict of Laws § 117 cmt. c (1971)). "[W]hile the public policy doctrine is not moribund, it is in fact rarely relied upon. Only in clear-cut cases ought it to avail defendant." Id. at 866 n.17 (citations omitted). In Tahan, plaintiff (an Israeli citizen) acted as the travel agent for defendant's company in Israel until a dispute arose and their relationship ended. Plaintiff obtained a default judgment in Israel against defendant for about $58,000, and sought to enforce the judgment in the United States. The district court denied the motion to enforce, on the ground that the foreign judgment was contrary to U.S. public policy. The court of appeals reversed. On appeal defendant argued that the Israeli court's judgment was unenforceable for three main reasons. First, he was not properly served because the original service papers were in Hebrew. Second, he did not receive a second notice at least three days prior to hearing and application for default judgment, as provided for in the Federal Rules of Civil Procedure. Third, the Israeli court did not provide a "compelling justification" to pierce the corporate veil when it entered judgment against him personally. The appellate court found that these arguments were "by no means unreasonable." Id. at 866. Nevertheless, the court held that the Israeli court's decision – although at odds with U.S. law – was not "repugnant" to it and could be enforced.

Similarly, in Ingenohl v. Olsen & Co., 273 U.S. 541 (1927), the Filipino Supreme Court considered whether to enforce a decision of the Hong Kong Supreme Court regarding a

trademark dispute.  The Filipino Court reviewed the foreign decision to see if was based on a

"clear mistake of law or fact."  Applying that standard, enforcement of the Hong Kong judgment

was denied.  The U.S. Supreme Court, on writ of certiorari to the Filipino Supreme Court,

reversed.  It held that the Hong Kong decision settled the rights of the parties in Hong Kong, and

the Filipino Court should not have reviewed the decision under the "clear mistake of law or fact"

standard.  As the Court held, when a judge in Hong Kong "is the final exponent of [the relevant]

law . . . we do not see how it is possible for a foreign court to pronounce his decision wrong."  Id.

at 544.

        In this case, plaintiffs contend that the Columbian decisions violated U.S. public policy.

Yet they had little trouble in deciding to litigate their breach of contract claim in Columbia.  This

action alone suggests considerable confidence and trust in the Columbian court system.  They

now have decided to withdraw their claim (after years of litigation) and their Columbian counsel

is withdrawing.  However, there is evidence that the withdrawal was due more to a strategic

decision about the likelihood of success.  See Letter from Chemas to Gold (Nov. 30, 2005) (Ex.

C to Gold Decl. (Feb. 17, 2006)).

        Nevertheless, plaintiffs rely on the declaration of Fernando Mantilla-Serrando, a

Columbian lawyer also licensed to practice in New York, France, and Spain, to argue that the

Columbian court's decision violated U.S. public policy.  According to Mantilla-Serrano's own

explanation, the Council of State ruled that the arbitration agreement, as amended by the parties

on January 15, 1998, had an invalid object or purpose because it specified that the parties were to

follow International Chamber of Commerce ("ICC") procedures.  "The Court found this illegality

based on the fact that on that date Columbian arbitration law did not allow the parties to a

domestic arbitration to subscribe to arbitration that would proceed in accordance with the ICC

Rules." Opp. Ex. 3 (Mantilla-Serrano Decl.) ¶ 4.  He concedes that Columbian law did not allow

the parties to incorporate ICC procedural rules, and he implicitly concedes that the correct law to

apply is the law in existence when the Agreement was first amended (January 15, 1998).[9]  Yet he

maintains that the illegal procedural rules were not an "object or purpose" of the agreement under

Columbian law; they were "ancillary."  See id. ¶ 11.  As a result of this and other errors,

Mantilla-Serrano concludes that the Columbian court's explanation "can hardly be explained as

anything other than a decision that was aimed at producing a particular result: nullification of the

Termorio award."  Id.  ¶ 10.

Even assuming that Mantilla-Serrano's analysis is accurate, it falls far short of meeting

the high standard required to preclude enforcement of a foreign judgment.

On a factual basis, as defendants note, if the Columbian court was reaching for *any* reason

to nullify the award, it is illogical that it would first reject in detail defendants' other arguments

for nullifying the award.  See, e.g., Mantilla-Serrano Decl. ¶ 5 n.1 ("Electranta advanced

numerous arguments for setting aside the Arbitral Award based on the ground that the arbitration

agreement was invalid due to an illegal object, but it did not mention the ground ultimately relied

on by the Council of State for its finding of illegal object or purpose of the arbitration

agreement.").[10]  Moreover, plaintiffs concede that they do not specifically allege that Columbian

---

[9]As he explained, "the Court relied on a classic precept of the interpretation of contracts, Article 38 of Law 153 of 1887 [], which states that '[e]very contract shall incorporate the laws in force on the date the contract is made.'" Id. ¶ 9.

[10]Its decision to raise the issue sua sponte is hardly cause for alarm; U.S. courts have followed this practice as well.  See United States v. Duran, 96 F.3d 1495, 1510 (D.C. Cir. 1996); Kelso v. U.S. Dep't of State, 13 F. Supp. 2d 1, 7 (D.D.C. 1998).

courts are corrupt.  When asked at oral argument if there was evidence of corruption in the

Columbian courts, counsel for plaintiffs stated, "we have our beliefs, Your Honor, but our beliefs

are not evidence.  We have not put in evidence of corruption . . ."  Hearing Tr. (2/23/06) at 47.

On a legal basis, it takes much more than an allegation that a decision was results-

oriented to demonstrate that it was "repugnant," particularly when, as here, the decision seems

plausible on the merits.[11]  Consistent with Ingenohl, a determination even that the Columbian

court made a clear mistake is not sufficient to refuse to enforce it.

### D.      Forum Non Conveniens

For the foregoing reasons, plaintiffs' complaint is dismissed on the merits.  In the

alternative, the complaint – lacking virtually any connection to the United States – should be

dismissed on the ground of forum non conveniens.  This matter is a peculiarly Columbian affair,

and should properly be adjudicated in that country.

Under Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981), courts employ a two-part test to

determine if forum non conveniens will be invoked as a basis for dismissal.  First, the party

seeking dismissal on the basis of a purportedly inconvenient forum must show that an adequate

alternative forum exists.  See id. at 254 n.22; see also El-Fadl v. Central Bank of Jordan, 75 F.3d

---

[11]Plaintiffs also offer the Declaration of George A. Bermann, a Professor of Law at Columbia University.  Professor Bermann's Declaration reviews the purpose and application of arbitration law both here in the United States and globally.  It does not, however, provide any further evidentiary support for the notion that the Columbian court's decision was contrary to public policy.

Similarly, plaintiffs provide the Declaration of Ivan L. Gold, an investor in LeaseCo.  His Declaration states that he and two others have been preliminarily indicted for "procedural fraud."  See Opp. Ex. 4 (Gold Decl.) ¶¶ 41-42.  Aside from innuendo and arguments of counsel, there is no evidence that these indictments were without merit or designed to unduly influence those involved in the arbitration.

668, 676 (D.C. Cir. 1996).  If the party is able to meet that burden, the court then weighs the

relevant public and private factors in favor and against litigation in either forum.  See id. at 676;

679.

        1.       Adequacy of Forum

In determining whether a foreign state's forum is adequate, courts are not to place undue

weight on the possibility of a change in substantive law.  See Piper, 454 U.S. at 247.  Nor is a

foreign forum inadequate because of different adjudicative procedures or general allegations of

corruption in the judicial system.  See El-Fadl, 75 F.3d at 678.

Defendants assert that Columbia provides an adequate alternative forum for the plaintiffs'

claims.  First, plaintiffs' two remaining claims have already been litigated in Columbian courts,

which demonstrates that defendants are subject to those courts' jurisdiction and that the courts

are available to resolve the disputes.  That the Columbian courts ultimately ruled against

TermoRio does not render it an inadequate forum.  Indeed, at least two courts have previously

found that Columbian courts are adequate.  See In re: Ford Motor Co., 344 F.3d 648, 650, 652

(7th Cir. 2003) (noting "everyone agreed" with district court finding that Columbian courts were

adequate forum for product liability cases); Iragorri v. Int'l Elevator, 203 F.3d 8, 13-14 (1st Cir.

2000) (upholding finding that Columbian courts were adequate forum for wrongful death action).

As discussed supra, plaintiffs' decision to use these very same Columbian courts to bring

a breach of contract claim suggests very strongly that it is an adequate forum.  Moreover,

plaintiffs have presented no persuasive reason why Columbian courts are inadequate.

        2.       Public and Private Factors

Defendants argue that the public and private factors favor litigation in Columbia.  First,

although plaintiffs' choice of forum is given a strong presumption, that presumption "carries much less weight when the plaintiff is also a stranger to the forum." BPA Int'l v. Kingdom of Sweden, 281 F. Supp. 2d 73, 85 (D.D.C. 2003) (citing Piper, 454 U.S. at 256).

In balancing the private parties' concerns, courts consider "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). To determine the public interest, the courts look to the

> "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Piper, 454 U.S. at 241 n.6 (quoting Gulf Oil, 330 U.S. at 508-09).

Defendants argue that none of the private factors counsels in favor of litigating the case here. "Most, if not all, of the potential witnesses and evidence will likely be located in Columbia, and therefore will be beyond the reach of this Court's compulsory process. In addition, the cost of witness attendance will be very high if the case proceeds in Washington, D.C." Mot. at 33.

Defendants also contend that none of the public interest factors weighs in favor of D.C. either. No party still in the suit has a connection with Washington or the United States.

Columbia, in contrast, has a strong interest in deciding this case, when the parties are all in Columbia, the relevant documents (in Spanish) are in Columbia, and the parties entered into an agreement in Columbia concerning a Columbian project.

Plaintiffs offer no persuasive rebuttal on the public/private interest factors analysis. Indeed, they concede that there will be difficulties in trying the case here.  As counsel for plaintiffs stated at oral argument, "I will certainly admit that we are going to have a really interesting time proving our case . . . . If we can convince our witnesses to come up from Columbia, we're going to try to bring them, because convincing them will be difficult."  Hearing Tr. (2/23/06), at 58.

Defendants' argument is persuasive.  Therefore, this case is alternatively dismissed on ground of forum non conveniens.

## III.    Conclusion

For the foregoing reasons, an accompanying Order dismisses plaintiffs' complaint.


/s/

Louis F. Oberdorfer
UNITED STATE DISTRICT JUDGE

Dated: March 17, 2006